IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **JASMINE SELENA DONERSON,** | Case No. 1:16 CV 3028 |
| Plaintiff, | Judge James Gwin |
| v. | Magistrate Judge James R. Knepp, II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | REPORT AND RECOMMENDATION |

## INTRODUCTION

Plaintiff Jasmine Selena Donerson ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny child's insurance benefits ("CIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated December 20, 2016). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for CIB and SSI in July 2013, alleging a disability onset date of January 1, 2010. (Tr. 146-50). Her claims were denied initially and upon reconsideration. (Tr. 85-90, 96-107). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 108). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 24, 2015. (Tr. 28-54). On September 8, 2015, the ALJ found Plaintiff not disabled in a written

decision. (Tr. 12-21). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on December 20, 2016. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background and Testimony

Plaintiff was born in August 1995, and was fourteen years old at her alleged onset date of disability. (Tr. 19, 147). She had no education beyond high school, and had struggled to pass the Ohio graduation test. (Tr. 33-34).

Plaintiff testified she had six months of clinical health vocational training (to be a home health aide) while in high school (Tr. 34), and attempted the training a second time, but never obtained her certification because she "wasn't able to keep up with the class and pass the test they were asking [her] to pass." (Tr. 35). Plaintiff also worked as a cashier at KFC in 2012, but stopped because she was too busy with school, trying to pass the graduation test, and work. (Tr. 36). She also did some work caring for a disabled nephew, but stopped because she was not able to lift him as he grew. (Tr. 36-37).

Plaintiff testified that since 2014 she had worked for CVS as a cashier in the evenings two days per week. (Tr. 37). She worked part-time because she was "not able to do eight hour shifts" due to her headaches which were "really bad and [she] was to the point where [she] can't just be up for eight hours just on [her] feet doing multiple tasks a day." (Tr. 37-38). She worked four hours per day, two days per week. (Tr. 38). Plaintiff testified she was able to work the cashier job because she had days to rest in between her work days. (Tr. 39). She explained:

    Q    Okay. Well how are you doing on the job that you have now?

---

1. Plaintiff challenges only the ALJ's evaluation of her headaches, therefore, the undersigned only summarizes the related records and testimony here.

2

> A   It's okay because I worked Mondays and Thursdays, or I'll work - - I'll work a day and then I'll have a space in between - - in a week to rest, and you know, it's not - - it's not a lot. If I work that Thursday or Friday I have a couple days to go home and rest and then go back to work.
>
> Q   Well tell me about resting. Why do you - - what happens that you need to rest?
>
> A   Well, I'll be on my feet. I'll go in, I'll be rested for a couple of days and I'll be fine, but I'm - - I started getting these headaches about a year ago where they will last for two or three days, and when they're lasting it [is] like my whole body's shutting down. My eyes are hurting, my head is hurting, I'm nauseous, I just - - I'm just not - - I'm just not the same person to just be up, you know, and do the work and just be proficient as I - - as rested. I'm not getting much sleep. I'll go to work and it's like I just - - my whole body shuts down after a while.

(Tr. 39-40). Plaintiff testified that medication did not relieve her headaches. (Tr. 40). Plaintiff stated her headaches "get so bad" she "can't even lift [her] head up", "can't do anything" and is "stuck laying the bed all day." (Tr. 41).

Plaintiff testified to having difficulty sleeping, sleeping only three hours per night. (Tr. 46). She attributed her sleeping difficulty to anxiety and headaches. *Id.* When asked what she does to help a headache, Plaintiff testified: "Well, the first thing I do is I try to - - I try to eat, but after I eat and I have this headache I tend to get nauseous, so I have - - I don't get to finish my food and I'll just - - I'll try to go to sleep." *Id.*

Plaintiff tried to help out around the house (washing dishes, cleaning, and laundry), but took breaks due to her heart racing, or her head pounding. (Tr. 47).

In 2014, Plaintiff had also worked at T.J. Maxx marking down clearance items. (Tr. 38). She testified that job ended because she could not work full time and perform the job requirements. (Tr. 38-39).

Relevant Medical Evidence

In September 2010, Plaintiff underwent an evaluation with Sonia Shukla, M.D., at the MetroHealth Pediatric Neurology Clinic, due to headaches. (Tr. 445). Plaintiff reported headaches since age three, with a reevaluation at age eleven. *Id.* She reported headaches twice a week for the past year, with aspirin offering relief. *Id.* Plaintiff also reported that over the prior month, she had severe headaches every other day lasting for several hours. *Id.* These headaches cause pain of 10/10 at their peak, could last for eight to ten hours at a time, and Plaintiff reported needing to lie down in a dark room for relief. (Tr. 445-46). Plaintiff treated the headaches with Excedrin, a dark room, and no sound; the headaches were worse with light. (Tr. 446). After an examination, Dr. Shukla's impression was "most likely . . . caffeine withdrawal headaches." (Tr. 447). She also noted Plaintiff "could have tension vs transformed migraines" and that the "[p]ossibility of an intracranial mass or fluid collection cannot be ruled out." *Id.* Dr. Shukla advised Plaintiff on "how to manage headaches due to caffeine withdrawal and the importance to sleep [sic] proper amount every night." *Id.* She prescribed Naproxen, and ordered a head MRI and a visual acuity test. (Tr. 447-48).

In October 2010, Plaintiff presented to the emergency room with a migraine. (Tr. 228). She reported she last saw a neurologist two months prior "and was taken of[f] all meds to see what happens." *Id.* Plaintiff reported having three migraines since stopping non-steroidal anti-inflammatory medications. *Id.* Her headache improved "with rest alone" and Plaintiff was discharged. (Tr. 229). The physician noted there were "[n]o focal deficits on neuro exam" and that it was "[u]nlikely that [the headache] represents new or acute pathology." *Id.*

Later in October 2010, Plaintiff saw Debabrata Ghosh, M.D. in the Pediatric Neurology Clinic. (Tr. 234-36). Plaintiff's headaches had increased in the past year to twice a month, and then

4

daily for the prior two months. (Tr. 234). They were longer (all day instead of one hour), and typically occurred in the afternoon. *Id.* She had "bad headaches" once or twice per week; at other times they were "modest[,] about 6/10, dull aching." *Id.* Plaintiff's headaches typically occurred in the afternoon, and were accompanied by some blurring of vision and dizziness, as well as photophobia and phonophobia. *Id.* Excedrin helped, but Tylenol and ibuprofen did not. *Id.* On examination, Plaintiff was "well-appearing [and] undistressed." (Tr. 235). Her mental status examination was normal. *Id.* Dr. Ghosh opined that "[t]he reason for her daily nonprogressive headache is unclear . . . Her neurological examination is entirely normal and non-focal." (Tr. 236). Dr. Ghosh prescribed medication, and offered other preventative instructions ("good sleep hygiene, keep well hydrated, maintain a headache diary, avoid precipitating factors, stress relief if present, will require psychologic counseling. Avoid using analgesic more than twice per week. Avoid caffeinated products."). *Id.* She instructed Plaintiff to follow up in six months. *Id.*

In May 2011, on a Child/Adolescent Diagnostic Assessment, the reason for referral was noted as: "Family doctor is reporting client should see psychiatrist. Mother reports her daughter has headaches. Family Dr. feels that this may be because of emotional problems." (Tr. 523). The assessment noted Plaintiff reported no limitations of activities of daily living, and that Plaintiff volunteered, did public speaking, attended church sometimes, and listened to music and talked on the phone. (Tr. 525).

Plaintiff returned to the Pediatric Neurology Clinic in September 2011 (approximately eleven months after her prior visit). (Tr. 243-44). Plaintiff reported "continuous, aching and throbbing" headaches at a pain level of 9/10 every day. (Tr. 243). She had stopped taking prescribed medication because it made her sleepy. *Id.* Plaintiff reported missing 89 classes due to her headaches. *Id.* She reported the smell of peppers made her headaches worse, as did light, sound,

and fast movements. *Id.* The "detailed neurological examination [was] entirely normal and non focal." (Tr. 244). Dr. Ghosh's impression was that Plaintiff "is a 16 year old girl with migraine with aura, but more bothersome now is her chronic daily headache." *Id.* Dr. Ghosh prescribed a new preventive medication, and advised similar preventive instructions to her prior visit. *Id.* She also prescribed a medication to be used during severe headaches. *Id.* Dr. Ghosh instructed Plaintiff to follow up in six months. *Id.*

In September 2012 (one year later), Plaintiff returned to the Pediatric Neurology Clinic. (Tr. 247-48). Plaintiff reported she "was doing well until 3 months back when the headaches . . . [started] coming back, once or twice a day". (Tr. 247). Dr. Ghosh summarized Plaintiff's past medications: "Topamax made her sleepy, so did not take that. So changed to amitriptyline, took for 7 months,, then stopped, no side effect." *Id.* Once again, "[a] detailed neurological examination [was] entirely normal and non focal." (Tr. 248). Dr. Ghosh advised restarting amitriptyline, and avoiding daily analgesic use. *Id.*

Plaintiff returned to Dr. Ghosh in November 2012, reporting her headaches were "fine for 1 month, then once every other day, now every day for last 1 month". (Tr. 252). Her neurological examination was normal. (Tr. 253). Dr. Ghosh increased Plaintiff's medication. *Id.*

In October 2013, Plaintiff sought to establish care with Kavitha Srighanthan, M.D. (Tr. 615). She reported a long history of headaches, and that she had been diagnosed with chronic headaches due to stress. *Id.* She reported twice daily headaches, and minimal relief from her medications. *Id.* Dr. Srighanthan assessed "[m]edication overuse headache". (Tr. 618). She instructed Plaintiff to stop all medications, undergo a ten day course of prednisone, and then "only sparing use of excedrin." *Id.* She noted that if Plaintiff's headaches continued, she would refer her to neurology. *Id.*

In November 2013, Plaintiff returned to Dr. Srighanthan requesting a physical examination for work. (Tr. 686-89). There is no mention of headaches. *Id.*

In February 2014, Plaintiff returned to Dr. Srighanthan reporting daily headaches. (Tr. 695). Dr. Srighanthan assessed dysthymia "with several physical manifestations" and prescribed Effexor. (Tr. 696-97). She noted Plaintiff had an appointment with a new neurologist the following week. (Tr. 697).

In February 2014, Plaintiff wrote in a letter that she woke up every day with a headache. (Tr. 198). She stated that "for . . . 5 years I haven't been able to work or barely go to school because of my illness." *Id.* She indicated in a disability report her headaches were "so bad that I can't function and sometimes I have to have help feeding and dressing myself." (Tr. 194). She reported that her headaches were "so bad, most of my days, I spend in bed." *Id.*

In May 2014, Plaintiff went to Express Care for heartburn and back pain. (Tr. 705-08). She also reported a headache daily for three weeks, and that her medications were not working. (Tr. 706). Plaintiff was given Pepcid for her heartburn and told to tell follow up with her primary care physician if her symptoms continued. *Id.*

In June 2014, Plaintiff returned to Dr. Srighanthan complaining of back pain, heart burn, and abdominal pain. (Tr. 722). Dr. Srighanthan also noted Plaintiff's history of chronic daily headaches, that Plaintiff had been followed by a neurologist, "but no recent f/u d/t repeat cancellation of appointments", and that Plaintiff would like to transfer her care to MetroHealth. *Id.* Plaintiff was assessed with, *inter alia*, "[c]hronic daily headache" and referred to a neurologist. (Tr. 724).

*Opinion Evidence*

In September 2013, Plaintiff underwent a consultative physical examination with Eulogio Sioson, M.D. (Tr. 550-54). Plaintiff reported "throbbing aching headaches" twice per day, lasting two hours at a time, and that her prescribed medication did not help. (Tr. 550). Dr. Sioson's impression was "Headaches –no focal neurological deficit". (Tr. 551). He noted, "[i]n summary, [manual muscle testing], [range of motion] data showed no significant objective findings that will limit ability to do light work-related activities." *Id.*

Later in September 2013, state agency physician Lynne Torello, M.D., opined that Plaintiff could perform medium work, with some environmental limitations due to asthma. (Tr. 61-62). State agency physician Diane Manos, M.D. affirmed this conclusion in January 2014, finding there was "no material change in function" on reconsideration. (Tr. 75-76).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

Under the Social Security Act, a claimant is entitled to CIB if she the child of an insured person entitled to old-age or disability benefits and was disabled prior to the age of twenty-two. *See* 42 U.S.C. § 402(d).

## DISCUSSION

Plaintiff contends the ALJ erred in: 1) her credibility analysis; and 2) her RFC / Step Five determination. The Commissioner responds the ALJ did not err, and her decision is supported by substantial evidence. For the reasons discussed below, the undersigned recommends the Court affirm the decision of the Commissioner.

Credibility / Subjective Symptoms

The Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 416.929(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). Where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has

the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

A claimant's assertions of disabling pain and limitation are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). In determining whether a claimant has disabling pain, the regulations require an ALJ to consider certain factors including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR . . . 416.929(c) describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements").[2] Although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *Roberts v. Astrue*, 2010 WL 2342492, at *11 (N.D. Ohio).

---

2. Subsequent to the date of the ALJ's decision, the Social Security Administration issued new Social Security Ruling 16-3p, which supersedes Social Security Ruling 96-7p. The Sixth Circuit, while declining to reach the issue of whether SSR 16-3p should apply retroactively, characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Ec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 F. App'x at 801 (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. An ALJ's finding that a claimant's subjective allegations are not fully supported is a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted). Nevertheless, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2.

The ALJ in this case explained that she considered Plaintiff's subjective symptom reports, and found them not entirely credible:

> The claimant reported daily headaches and migraines, as well as chest pains, and alleged that inhalers have not helped with her asthma [citing Tr. 198-99]. Further, she testified that she could not work full time due to headaches and an inability to stand for long periods or lift heavy items.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

> Despite the claimant's allegations, she worked during the period in question. Most significantly, the claimant admitted that she still worked as of the day of the hearing, when she testified that she still worked part time, four hours per day, twice a week, as a cashier at CVS. Further, medical evidence detailed below suggest the claimant's impairments are not as severe as she has alleged.
>
> Record evidence confirmed the claimant's history of migraines and asthma as early as the age of 10 [citing Tr. 547]. However, treatment notes revealed the reason for daily nonprogressive headaches was unclear, and a neurological exam was entirely normal and nonfocal [citing Tr. 228, 236]. Further, treatment notes listed the claimant's asthma as well-controlled [citing Tr. 239]. Further, despite having shortness of breath related to asthma since childhood, the claimant has never been hospitalized or presented to emergency for asthma [citing Tr. 550].

(Tr. 17).

The ALJ's reasons for finding Plaintiff's allegations of disabling symptoms less than fully credible are supported by the record. First, the ALJ noted Plaintiff's allegations of disabling symptoms stemming from her migraines lacked the support of objective medical evidence. (Tr. 17). This is one factor to be considered under the regulations. *See* 20 C.F.R. § 416.929(c). Although Plaintiff cites a district court case from outside the Sixth Circuit holding it improper to rely on a lack of objective evidence with regard to migraines to discount credibility, *see Stebbins v. Barnhart*, 2003 WL 23200371 (W.D. Wis.), the Sixth Circuit and courts within have held the opposite, *see e.g., Long v. Comm'r of Soc. Sec.*, 56 F. App'x 213, 214 (6th Cir. 2003) (explaining that "subjective complaints of pain during the physician visits, or the eventual diagnosis of claimant's condition, [are not] credible enough to rise to the level of 'objective medical evidence'" and "the lack of objective evidence substantiating the alleged disabling headaches is what precludes the allowance of disability benefits"); *Frankowski v. Astrue*, 2012 WL 6153399, at *7 (N.D. Ohio) ("Plaintiff points to medical records related to his treatment for migraine headaches, as well as his own testimony regarding their severity and frequency. However, he does not identify any objective record evidence establishing the severity of his migraines, or their effect on his

13

ability to work."), *report and recommendation adopted by* 2012 WL 6152998. The same is true here, and thus the ALJ did not err in relying on the lack of objective evidence as one factor in discounting Plaintiff's credibility regarding the limiting effects of her migraines.

Second, the ALJ noted Plaintiff was able to work part-time. (Tr. 17). This is also supported by the record. *See* Tr. 37-38. An ALJ may consider an individual's ability to maintain part-time employment in assessing credibility. *See Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (while the ability to work part-time is not necessarily indicative of the ability to work full-time, the "ability to maintain part-time employment [is] one factor relevant to the determination of whether [a claimant] [is] disabled."). The ALJ determined Plaintiff's part-time work activity was one factor that was inconsistent with her allegations regarding the extent of her pain. *See* Tr. 21. Plaintiff argues that her testimony about "the way she works actually bolsters the credibility of her allegations." (Doc. 14, at 9) (emphasis in original). This is so, she argues, because she testified that she could work a four-hour shift, take a break for several days, and then work again. *Id.* However, there was conflicting evidence in the record on this point, and the ALJ was entitled to resolve that conflict so long as her decision is supported by substantial evidence. *See Workman*, 105 F. App'x at 800-01. The ALJ cited Plaintiff's February 2014 letter regarding her limitations. *See* Tr. 17 ("The claimant reported daily headaches and migraines . . . .") (citing Tr. 198-99). In that letter, Plaintiff stated she woke up with a headache every day and "for the [past] 5 years I haven't been able to work or barely go to school because of my illness." (Tr. 198). The ALJ then cited Plaintiff's part-time work as one reason for finding Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible". (Tr. 17). This was not error. An ALJ "is not required to accept a claimant's subjective complaints" or explanations. *Jones*, 36 F.3d at 475-76. Plaintiff's statements implied a near

14

complete inability to perform any activity, and those statements were undermined by her ability to work part-time. Thus, the ALJ's decision to discount her credibility in part on this basis was not error.

Further, Plaintiff's allegations of disabling migraine symptoms were not supported by any medical opinion evidence of record. *See* Tr. 17-19 (noting "medical evidence detailed below suggest[s] the claimant's impairments are not as severe as she has alleged" and summarizing, *inter alia*, the opinion evidence). For example, Dr. Sioson, who performed a physical consultative examination, discussed Plaintiff's migraines (Tr. 550), and listed an impression of "[h]eadaches – no focal neurological deficit", but did not opine as to any specific restrictions on employment resulting from those headaches (Tr. 551). Similarly, the state agency physicians had evidence of Plaintiff's migraine complaints, and both opined Plaintiff was capable of medium work, with some environmental limitations due to asthma. (Tr. 58-62; 67-76).[3] An ALJ may properly reject allegations of disabling pain based on inconsistency with medical opinions of record. *See Schooley v. Comm'r of Soc. Sec.*, 2015 WL 4925189, at *6 (N.D. Ohio) ("Furthermore, the medical opinions of four consultative examiners and all of the state agency reviewers concluded Plaintiff was capable of working and noted no particular limitations in relation to migraines or the negative effects the symptoms could have on Plaintiff's ability to work.").

---

3. Moreover, although Plaintiff does not challenge the ALJ's credibility determination with regard to her asthma, the ALJ pointed to specific inconsistencies between Plaintiff's allegation that inhalers had not helped with her asthma and the treatment record. *See* Tr. 17-18 (citing Tr. 239, 547, 550). This analysis was part of the ALJ's overall evaluation of the credibility of Plaintiff's subjective symptom reports, and is supported by the evidence cited. *See* Tr. 239 (October 2010 treatment note stating Plaintiff's asthma was "well controlled"); Tr. 547 (note from August 2013 consultative examination that Plaintiff had never been hospitalized overnight for asthma episodes); Tr. 550 (note from September 2013 consultative examination regarding Plaintiff's asthma and that she had never been hospitalized or visited the emergency room for the condition).

The Court's review is limited to determining whether an ALJ's reasons for discrediting a claimant's allegations are reasonable and supported by substantial evidence of record. *See Jones*, 336 F.3d at 476. Certainly, there are places in the record which support Plaintiff's allegations of severe migraine pain, but the question on review is not whether substantial evidence could support another conclusion but rather whether substantial evidence supports the ALJ's conclusion. *Id.* For the reasons discussed above, the undersigned concludes the ALJ did not err in her analysis of Plaintiff's subjective symptom statements and that analysis is supported by substantial evidence.

RFC / Step Five Determination

In a related argument, Plaintiff contends that "[s]ince the ALJ's residual functional capacity analysis, and the hypothetical questions based upon it, were not based upon substantial evidence, the VE's testimony also does not constitute substantial evidence for the ALJ's conclusion that Ms. Donerson could perform any work." (Doc. 14, at 10). The Commissioner responds that substantial evidence supports the ALJ's RFC finding. (Doc. 15, at 16-18).

Plaintiff's challenge is, in essence, a challenge to the ALJ's decision not to incorporate any work-related limitations related to her migraines into the RFC. A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.* § 416.929. The RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician.").

Here, the ALJ evaluated the evidence of record in making her determination; she discussed Plaintiff's statements, testimony, treatment notes, and medical opinions of record. (Tr. 17-19). As noted above, the ALJ's credibility determination was supported by substantial evidence. And (as

also noted above), the ALJ's decision not to include any work-related limitations based on Plaintiff's migraines was also supported by the evidence of record in which no medical opinion was offered suggesting such restrictions were necessary. *See* Tr. 550-51 (consultative physical examination listing no restrictions from migraines); Tr. 58-62 & 67-76 (state agency reviewing physician opinions listing no functional restrictions from migraines). Moreover, while Plaintiff had ongoing treatment for her headaches, nowhere did any of her treating physicians opine as to resulting functional restrictions. *See* Tr. 228-29; 234-36; 243-44; 247-48; 252-53; 445-48; 615-18; 686-89; 696-97; 706; 722-24. This Court and others have found, in the context of migraines, an ALJ's RFC supported where the ALJ considers, *e.g.*, daily activities, a lack of supporting objective evidence, and a lack of supporting medical opinion evidence. *See Schooley*, 2015 WL 4925189, at *6 (finding no error in ALJ's failure to include migraine-related restrictions where ALJ considered objective evidence, treatment records, inconsistent activities of daily living, and medical opinions); *Frankowski*, 2012 WL 6153399, at *7 (finding no error in failure to include migraine-related restrictions where Plaintiff pointed to treatment records, and his testimony, but no objective medical evidence of migraines), *report and recommendation adopted by* 2012 WL 6152998. The undersigned similarly finds no error in the ALJ's RFC analysis here.

Because the ALJ's hypothetical question to the VE here reflected the ultimate RFC, the VE's testimony that Plaintiff could perform jobs that exist in significant numbers in the national economy provides substantial evidence the Plaintiff is not disabled. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). As such, there was no error at Step Five.

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and CIB supported by substantial evidence and recommends the decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).